USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/8/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA

V.                                                              14 CR 810 (CM)

KEVIN FRYE,

        Defendant.

------------------------------------------------------------x

## DECISION AND ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

On July 13, 2016 this Court sentenced Kevin Frye to 115 months' imprisonment, in connection with his guilty plea to conspiring to distribute oxycodone in violation of 18 U.S.C. § 846. Frye is presently incarcerated at FCC Beaumont – his projected release date September 11, 2023.

Before the Court is Frye's motion for compassionate release filed pursuant to 18 U.S.C. §3582(c)(1)(A)(i), as amended by the First Step Act ("FSA"), P.L. 115-391. Frye claims that he should be granted compassionate release based on a combination of (1) his serious health conditions, including latent tuberculosis infection and associated lung damage, Stage 2 hypertension, and overweight body mass index, and (2) the spread of COVID-19 at FCC Beaumont, which has been a hotspot for cases during the pandemic. (Def's Mot., Dkt. 543 at 2-3, 7).

The Government opposes Frye's motion, arguing that Frye's health conditions are insufficient to establish "extraordinary and compelling" reasons warranting his release, and that

consideration of the sentencing factors the Court must consider under 18 U.S.C. § 3553(a) counsels against a reduction in sentence.

Frye's motion is denied.

Compassionate Release

Under 18 U.S.C. § 3582(c), a district court "may not" modify a term of imprisonment once imposed, except under limited circumstances. One such circumstance is the so-called compassionate release provision, which provides that a district court "may reduce the term of imprisonment" where it finds "extraordinary and compelling circumstances." § 3582(c)(1)(A)(i). A motion under this provision may be made by either the Bureau of Prisons or a defendant, but in the latter case only "after the defendant has *fully exhausted all administrative rights* to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* (emphasis added). Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

If a defendant demonstrates that he has exhausted his administrative remedies with the BOP, the Court must then consider whether the defendant has met his burden of establishing "extraordinary and compelling circumstances" warranting release.[1] Until recently, this Court—and many of my district court colleagues—looked to United States Sentencing Guidelines § 1B1.13 (the applicable Guidelines section for sentencing reductions pursuant 18 U.S.C. § 3582(c)(1)(A)(i)), for guidance on what constituted "extraordinary and compelling

---

[1] "A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue." *See, e.g.*, United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992).

<s>circumstances."[2] That changed on September 25, 2020, when the United States Court of Appeals for the Second Circuit held that § 1B1.13 is not applicable to a motion brought by a defendant in the district court. *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020). The Second Circuit reasoned that the language of § 1B1.13—language that has not been updated since the passing of the First Step Act—addressed only sentencing reduction motions initiated by the Bureau of Prisons. *Id.* In making clear that the district court was not constrained by the narrow grounds for granting compassionate release in § 1B1.13, the Second Circuit declared unequivocally that "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release," and that "Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion." *Id* at 237.</s>

What *Brooker* did not change, however, is the mandate in § 3582(c)(1)(A)(i) that a court contemplating a defendant's release pursuant to that section must first consider the sentencing

---

[2] The Application Notes to Section 1B1.13 describe the circumstances under which "extraordinary and compelling reasons" exist. *See* § 1B1.13 comment (n.1). For example, the medical circumstances ground reads as follows:

(A) Medical Condition of the Defendant.—

    (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia

    (ii) The defendant is—

        (I) suffering from a serious physical or medical condition,

        (II) suffering from a serious functional or cognitive impairment, or

        (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self- care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 comment (n.1).

factors at 18 U.S.C. § 3553(a), to the extent they are applicable, and determine whether they counsel for or against release. A court may still deny compassionate release where the § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

### Frye Has Exhausted His Administrative Remedies

The government does not dispute that Frye has exhausted his administrative remedies. Frye submitted his request for compassionate release to the Warden of USP Beaumont on June 26, 2020, which the Warden denied on July 20, 2020. Frye's original *pro se* motion for compassionate release was dated August 4, 2020, and docketed September 4, 2020. (Dkt. 520.) More than 30 days elapsed between the Warden's denial of Frye's request and his application to this Court on the same grounds. The exhaustion requirement is satisfied.

### Frye's Motion

Post *Brooker*, in the context of a compassionate release motion predicated on an inmate's poor health and the risk of contracting COVID-19 in prison, the Court may now recognize the obvious: An inmate (1) in a Bureau of Prisons Facility with a high rate of COVID-19 infections, and (2) who suffers from health conditions found by the Center for Disease Control to place a person at an increased risk of suffering a severe outcome from Covid-19, has met the threshold "extraordinary and compelling" standard warranting compassionate release.

Frye, now 43 years old, suffers from latent tuberculosis and associated lung damage, Stage 2 hypertension, and an overweight BMI. According to Dr. Jessica Dekhtyar, these three conditions put Frye at an elevated risk of severe and potentially fatal complications from COVID-19. (Dkt. 543 at 4-6.) The risks stemming from Frye's tuberculosis diagnosis are twofold: the risk that infection with COVID-19 could reactivate his tuberculosis infection, and the risk that his

tuberculosis-damaged lungs will be unable to handle the strain of COVID-19. (Dekhtyar Rpt. at 2-3.) Frye also suffers from asthma and several untreated ailments, including the fracture of his ribs and an unidentified illness in November 2020 that caused him to vomit blood. (*Ibid.*) "Chronic lung diseases," hypertension, and overweight appear on the CDC's list of conditions that can place individuals at a higher risk of severe illness from COVID-19.[3]

FCC Beaumont is located in southeast Texas, an area that has experienced several large-scale outbreaks of COVID-19. FCC Beaumont has had a total of 1421 inmates test positive for COVID-19. USP Beaumont – the specific facility in which Frye is incarcerated – has had a total of 278 inmates test positive. There are currently 35 active cases at the facility.[4] By no means has Beaumont had the highest number of inmate positives, but it is still a less than ideal place to be for someone with comorbidities like Frye's. Moreover, Frye has had to remain alone in his cell for 23 to 24 hours a day, as part of the BOP's efforts to contain the spread of the virus within the prison complex, which has interfered with his ability to participate in drug-treatment and other educational programming. (Dkt. 543 at 7.)

The government does not dispute that Frye has been diagnosed with hypertension and latent tuberculosis, but argues that they are "well controlled." The government also argues that Frye is "physically active" and not sufficiently overweight for his weight to count as a risk factor for severe illness. (Dkt. 544 at 6-7.) Nonetheless, the Court agrees with Frye that his medical conditions, when coupled with the high rates of COVID-19 in FCC Beaumont, might very well constitute an "extraordinary and compelling" basis for granting compassionate release.

---

[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Apr. 6, 2021).
[4] https://www.bop.gov/coronavirus/ (last visited Apr. 2, 2021).

However, the sentencing factors set forth at 18 U.S.C. § 3553(a)—which the Court must consider in connection with a motion for a sentence reduction, see 18 U.S.C. § 3582(c)(1)(A)—strongly counsel against any reduction in Frye's sentence. Principal among those considerations are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1), (2) (A-C).

Frye held a senior role in a massive oxycodone distribution scheme that was operated out of three sham pain management facilities across New York City. (PSR ¶ 38.) Frye worked as a "Crew Chief," and in that role he recruited and paid crew members to pose as "patients" in order to receive medically unnecessary prescriptions for oxycodone from Dr. Moshe Mirilashvili, a co-defendant involved in the conspiracy. (*Id.* ¶¶ 17-19.) As a Crew Chief, Frye arranged for and oversaw the filling of the resulting prescriptions and took possession of the oxycodone pills for resale to thousands of addicts. (*Id.* ¶¶ 22-23.) Frye also posed as a patient himself, and obtained hundreds of oxycodone tablets in his own name. (*Id.* ¶¶ 30, 35.) In total, Frye was responsible for the distribution of at least 1860 30-milligram tablets of oxycodone. (*Id.* ¶ 54.)

Frye also put officers and the public in considerable danger during his arrest. While fleeing from the U.S. Marshals, Frye crashed his car into a highway partition and fled into a nearby wooded area, where he was eventually apprehended. Several law enforcement agents were injured during the pursuit. (*Id.* ¶ 53.)

When I sentenced Frye in 2016, I said:

The crime in which you participated had so many victims. It was such a horrible operation that you were helping to run, and you played a pretty senior role in it. . . . It was the drug

dealers on the street, of whom the crew chiefs were the kingpins, in quotes, that made this whole thing possible, and that allowed a corrupt physician to profit at the benefit of a lot of truly pathetic people, and you too to profit.

(Dkt. 343 at 20:20-21:4.) The severity of Frye's sentence reflected the incalculable harm he caused to the communities in which the clinics were based, and which now counsels against release.

Frye's extensive criminal history also counsels against release. That history consists of the following:

- In 1993, when he was 16 years old, Frye was convicted of robbery, was sentenced to 1 to 3 years' imprisonment, and served 21 months before being released on parole (PSR ¶ 70);

- In 1997, Frye pleaded guilty to criminal possession of marijuana and was sentenced to time served (*id.* ¶ 71);

- In 1998 Frye was convicted of selling a controlled substance to an undercover police officer, and was sentenced to 2 to 4 years' imprisonment (*id.* ¶ 72);

- In 1998, Frye pleaded guilty to attempted criminal possession of a weapon after he was found with a loaded .45 caliber handgun, and was sentenced to 3 years' imprisonment (*id.* ¶ 73);

- In 2002, Frye was convicted of possession of contraband while in prison, and was sentenced to 15 days' imprisonment (*id.* ¶ 74);

- In 2005, Frye pleaded guilty to criminal possession of marijuana, and was sentenced to time served (*id.* ¶ 75);

- In 2005, Frye was sentenced to 5 to 12 years' imprisonment with 2 years' post-release supervision for delivery of a controlled substance (cocaine) (*id.* ¶ 76);

- In 2007, Frye pleaded guilty to reckless endangerment when he attempted to evade police on a motorcycle, disregarded traffic lights, and drove on the sidewalk, and was sentenced to time served (*id.* ¶ 77).

At least three of those crimes occurred before Frye suffered a gunshot wound that his counsel argues set off his opioid addiction and involvement in the pill-distribution ring. (*See* Dkt. 543 at 3-4.) Notably, Frye was serving a term of parole for the second 2005 offense when he became involved in the pill-distribution ring. (Dkt. 544 at 11.) His significant criminal history, which put

him in criminal history category VI at the time of this sentencing in 2016, contributed to his original ten-year sentence, and is another reason why I must now deny his motion.

Moreover, I am not persuaded that the 86 months that Frye has already served are sufficient to deter him from committing future crimes. Although his seemingly successful efforts to fight his opioid addiction and take advantage of the educational opportunities at FCC Beaumont are laudable, Frye was disciplined in 2019 for assaulting another inmate. (*Id.* at 10.) And I am not persuaded that being under federal supervision upon release would deter Frye from committing future crimes, given that he committed the instant offense while on state parole.

Releasing Frye now would undermine the § 3553(a) factors that this Court must consider when deciding a motion for compassionate release.

The motion for compassionate release is denied.

April 7, 2021

Colleen McMahon
Chief Judge